# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| POTOMAC RIVERKEEPER, INC., d/b/a POTOMAC RIVERKEEPER NETWORK, 3070 M Street, NW Washington, DC 20007<br><br>NATURAL RESOURCES DEFENSE COUNCIL, INC., 40 West 20th Street New York, NY 10011,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF THE NAVY, 1000 Navy Pentagon Washington, DC 20350-1200,<br><br>*Defendant*. | No. 8:23-cv-1650<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1.     For more than a century, the U.S. Navy has conducted weapons research, development, testing, and evaluation at a naval installation called Naval Support Facility (NSF) Dahlgren, on the western shore of the Potomac River.

2.     The Navy conducts some of its weapons testing on land or in laboratories indoors. But the Navy also fires weapons directly into the Potomac River, along a 51-nautical mile stretch designated part of the Potomac River Test Range. This is the nation's largest over-the-water gun-firing range.

3.     The Navy uses the Potomac River as a proving ground to develop and test small arms, large-caliber guns, explosives, lasers, propellants, and targeting systems. In total, the Navy has discharged more than 33 million pounds of munitions into the Potomac River.

4.     These munitions contain toxic metals, solvents, explosives, and other potentially harmful constituents.

5.     The objective of the Clean Water Act is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In support of this objective, the Act prohibits the discharge of any pollutant from a point source into a navigable water unless pursuant to a lawful permit.

6.     Such permits are issued by the U.S. Environmental Protection Agency (EPA) or an authorized state agency under the National Pollutant Discharge Elimination

System (NPDES) program. These permits limit the types and amounts of pollutants that may be discharged, and they impose monitoring and reporting obligations on the discharger.

7. The Navy discharges pollutants from point sources into the Potomac River, a navigable water, by firing munitions into the river. But the Navy's weapons testing activities at NSF Dahlgren have never been regulated by an NPDES permit, and the Navy's ongoing, unpermitted discharges of pollutants into the Potomac River violate the Clean Water Act.

8. Plaintiffs seek a declaration that the Navy has violated and continues to violate the law by discharging pollutants into the Potomac River without a permit. Plaintiffs seek an injunction ordering the Navy to secure a discharge permit from the relevant state agency—here, the Maryland Department of the Environment—to regulate the Navy's discharges of pollutants into the river.

## JURISDICTION AND VENUE

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 33 U.S.C. § 1365(a)(1) (Clean Water Act).

10. As required by 33 U.S.C. § 1365(b)(1)(A) and 40 C.F.R. § 135.2, Plaintiffs Potomac Riverkeeper Network and Natural Resources Defense Council notified the Defendant in writing on January 26, 2023, of their intent to file suit against the

Defendant for its continuing violations of the Clean Water Act in the Potomac River. A copy of this notice letter is attached as Exhibit A.

11. Pursuant to 40 C.F.R. § 135.2(a)(3), Plaintiffs served the notice letter by certified mail on the Secretary of the U.S. Department of the Navy, with copies sent to the EPA Administrator, the Regional Administrator of EPA for the Mid-Atlantic Regional Office, the Attorney General of the United States, the then-Acting Secretary of the Maryland Department of the Environment, and the Director of the Virginia Department of Environmental Quality.

12. By law, per 40 C.F.R. § 135.2(c), this notice was deemed served on the postmark date of January 26, 2023. More than 60 days have passed since that date, and the Navy has not taken corrective action to cure its Clean Water Act violations.

13. The violations identified in the notice letter are continuous and ongoing. Neither the EPA Administrator nor any state has commenced and diligently prosecuted an action in court to compel the Navy's compliance with the Clean Water Act.

14. Venue is proper in this Court pursuant to 33 U.S.C. § 1365(c)(1), because the Navy unlawfully discharges pollutants in violation of 33 U.S.C. § 1311(a) as part of its weapons testing activities from point sources, including vessels and aircraft, in Maryland on or above the Potomac River. The Potomac River is in Maryland; the state boundary between Maryland and Virginia runs along the low-water mark on the Virginia side.

15. Assignment to the Southern Division of this Court is appropriate under Local Rule 501.4 because the events described in this complaint took place and continue to occur in the Southern Division (namely, in and on the Potomac River in Charles County and St. Mary's County, Maryland).

## PARTIES

16. Plaintiff Potomac Riverkeeper, Inc. is a non-profit 501(c)(3) membership organization doing business as the Potomac Riverkeeper Network.

17. Potomac Riverkeeper Network is dedicated to protecting, conserving, and restoring the Potomac River and its watershed. To achieve its goals, Potomac Riverkeeper Network implements educational programs, river cleanups, a volunteer water quality monitoring program, environmental initiatives, recreational activities, and environmental law enforcement efforts throughout the Potomac River watershed.

18. Plaintiff Natural Resources Defense Council (NRDC) is a non-profit, tax-exempt environmental and public health advocacy organization with hundreds of thousands of members nationwide, including in Maryland and Virginia. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC engages in research, advocacy, and litigation to support its mission of environmental protection.

19. Defendant United States Department of the Navy is the governmental instrumentality or agency responsible for the Clean Water Act violations challenged in

this complaint. The Naval Surface Warfare Center, Dahlgren Division (NSWCDD), a tenant of NSF Dahlgren, conducts the research, development, testing, and evaluation activities that cause the unpermitted discharges of pollutants into the Potomac River. NSWCDD is one of the Naval Surface Warfare Centers under the Naval Sea Systems Command of the U.S. Department of the Navy, and NSF Dahlgren is a Department of the Navy facility under the supporting command of Naval Support Activity, South Potomac, Naval District Washington.

## STANDING

20. Plaintiffs' members' use, enjoyment, and appreciation of the Potomac River have been and will continue to be harmed by the Navy's ongoing, unpermitted discharges of pollutants into the river through its weapons testing activities.

21. Plaintiff Potomac Riverkeeper Network's members include individuals concerned about the protection and restoration of the Potomac River, its tributaries, habitats, and resources, and who are dedicated to preserving and improving the cultural, historic, and environmental resources of the river. Potomac Riverkeeper Network's members fish, boat, and visit the shoreline and beaches on the Potomac River, including on the long stretch of the river used by the Navy for weapons testing.

22. Potomac Riverkeeper Network's members, including Emily Franc and Dean Naujoks, have recreational and aesthetic interests in a clean and healthy Potomac River. These interests are harmed by the Navy's unpermitted discharges of pollutants. Ms.

Franc and Mr. Naujoks frequently enjoy recreational activities such as boating on the Potomac River between Dahlgren, Virginia (where NSF Dahlgren is located) and the Chesapeake Bay, and they consume fish and shellfish from the lower Potomac. They intend to continue to enjoy the river and to eat local fish and shellfish. Ms. Franc and Mr. Naujoks regularly hear the Navy's weapons testing on the river and feel the impacts of explosions. They are worried that the Navy's unmonitored, unregulated discharges of pollutants into the river undermine downstream water quality. Ms. Franc and Mr. Naujoks are also concerned that toxic metals from discharged munitions could contaminate fish and shellfish for consumption in the lower Potomac. These concerns diminish their enjoyment of the river.

23. Other Potomac Riverkeeper Network members, including Michael Lightfoot, engage in commercial fishing in the river, downstream of the Navy's weapons testing facility. The viability of Mr. Lightfoot's commercial fishing enterprise depends on a healthy Potomac River. Mr. Lightfoot routinely hears noise from the Navy's testing activities during the week, and he is concerned about threats to the river's water quality from that weapons testing. Mr. Lightfoot is also worried about reputational harm to his business because of the Navy's unregulated discharges of pollutants in and near his commercial fishing grounds.

24. Plaintiff NRDC's members include individuals with recreational and aesthetic interests in the areas of the Potomac River threatened by the Navy's unpermitted

discharges during weapons testing. For example, NRDC member Aliya Haq regularly visits the Potomac River at Colonial Beach, Virginia, just downstream from NSF Dahlgren, with her two young children. Ms. Haq plans to continue visiting Colonial Beach with her family, and she is concerned that the Navy's discharges harm water quality in the river where she and her family like to wade. Her enjoyment of the Potomac River at Colonial Beach is diminished by the Navy's discharges of munitions without a permit.

25. If the Navy were ordered to secure a Clean Water Act permit for its Potomac River weapons testing activities, that would protect the recreational, aesthetic, and commercial interests of Plaintiffs' members, because a permit would impose restrictions on the Navy's discharges to ensure compliance with water quality standards in the river. *See* 40 C.F.R. §§ 122.4(d), 123.25(a)(1). A permit would also require water quality monitoring and reporting. *See id*. §§ 122.48(b), 122.41(j), (*l*), 123.25(a)(12), (19).

26. The Navy's failure to obtain a permit for its discharges also causes informational harms to the Potomac Riverkeeper Network. An NPDES permit would compel the Navy to monitor water quality, report the results, and disclose noncompliance with permit conditions. The Clean Water Act requires that monitoring reports relating to NPDES permits be publicly available. 33 U.S.C. § 1318(b). By failing to obtain and comply with an NDPES permit, the Navy deprives the Potomac Riverkeeper Network of valuable water quality information—to which it would be

7

entitled under the Clean Water Act—for its advocacy efforts, which include publishing reports about health risks and environmental harms from Potomac River pollution.

27. The Navy's failure to secure a Clean Water Act permit also causes organizational harm to Plaintiff Potomac Riverkeeper Network, whose mission includes protecting the river and performing public education about threats to the river. To fulfill those goals, Potomac Riverkeeper Network relies in part on the water quality monitoring results published by facilities that discharge into the river pursuant to NPDES permits. The Navy's failure to secure a permit impedes Potomac Riverkeeper Network's ability to accomplish its organizational objectives and carry out its public education effort. As a result, Potomac Riverkeeper Network is forced to spend additional resources to educate the public about river pollution caused by the Navy's weapons testing and to lobby for stronger safeguards—including by investigating incidents where watermen have recovered munitions from the riverbed and convening a public forum in a community near NSF Dahlgren earlier this year—that would be unnecessary if the Navy complied with its obligations under the Clean Water Act.

## STATUTORY AND REGULATORY BACKGROUND

28. The Clean Water Act prohibits the discharge of any pollutant from a point source into navigable waters unless authorized by an NPDES permit issued by EPA or a state that has been delegated permitting authority. 33 U.S.C. §§ 1311(a), 1342(a)(1).

29. The NPDES permit program in Maryland is administered by the Maryland

Department of the Environment.

30. The term "pollutant" includes, among other things, munitions, chemical wastes, and wrecked or discarded equipment. *Id.* § 1362(6).

31. The term "point source" means "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, . . . or vessel or other floating craft, from which pollutants are or may be discharged." *Id.* § 1362(14).

32. The term "navigable waters" means "the waters of the United States, including the territorial seas," *id.* § 1362(7), which includes the Potomac River.

33. Federal facilities, including military installations, are subject to the Clean Water Act's requirements. *Id.* § 1323(a).

34. The Clean Water Act includes two clauses that allow the President to exempt specific federal sources from permitting requirements. The first lets the President exempt "any effluent source" of any federal agency or department if it is "in the paramount interest of the United States" to do so. *Id*. Such exemptions expire after one year unless they are renewed. *Id.*

35. The second allows the President to issue regulations exempting military property from the requirements of the Clean Water Act, again if it is in the paramount interest of the United States to do so. *Id*. Any such regulations must be reconsidered every three years. *Id.*

9

36. The Clean Water Act allows any citizen to sue for violations of the law after providing 60 days' advance written notice to the violator, the EPA administrator, and the state where the violation occurs. *Id.* § 1365(a)(1), (b)(1), (f). The term "citizen" is defined for this purpose to mean any person with an interest that is or may be adversely affected. *Id.* § 1365(g). Plaintiffs are persons as defined in the Act. *Id.* § 1362(5).

## FACTUAL BACKGROUND

37. NSF Dahlgren was established in 1918 as the Dahlgren Naval Proving Ground. During World War I, the Navy developed weapons too heavy to move around existing test sites and too powerful to fire there. To address this problem, the Navy acquired land and built a military base in Dahlgren to give it access to a long, straight stretch of the Potomac River for weapons testing. When the facility was completed, the Navy fired the first shot into the river: a 153-pound projectile fired 11 miles from a 7-inch, 45-caliber gun.

38. The Navy has conducted outdoor weapons research, development, testing, and evaluation in the Potomac River continuously since then. These activities take place in an area designated the Potomac River Test Range, which includes a 51-nautical mile reach of the river, divided into regions labeled the Upper, Middle, and Lower Danger Zones.

39. A map of the Potomac River Test Range published by the Navy is below:



40.     The Navy tests and fires small arms, large-caliber guns, explosives, and other types of munitions in the Potomac River.

41.     Some weapons are fired from gun batteries on land. On information and belief, others are fired or released from vessels or drones on or above the Potomac River. The Navy fires some weapons at physical targets that are destroyed on or above the river.

42.     The Navy closes the relevant stretch of the Potomac River to commercial and recreational use during weapons testing. *See* 33 C.F.R. § 334.230. Naval operations that impede public use of the river are generally limited to Monday to Friday between 8am

and 5pm. *Id*. § 334.230(a)(2).

43. The Navy's weapons testing activities have a discernible effect on the Potomac River. People have long reported finding weapon shells and other physical evidence of the Navy's testing activities on the river bottom, such as this projectile, photographed by a boater in 2020:



44. People also see large eruptions in the Potomac River caused by the Navy's testing activities, like this one, recorded in March 2023, in Colonial Beach, Virginia:



45.     In a 2013 analysis, the Navy estimated the total weight of various munitions constituents that it shot into the Potomac River from 1918 to 2007. The Navy concluded that it discharged approximately 33 million pounds of constituents into the river, including more than 80,000 pounds (40 tons) of the explosive RDX, 430,000 pounds (215 tons) of the explosive ammonium picrate, 450,000 pounds (225 tons) of the toxic heavy metal manganese, and more than 30 million pounds (15,000 tons) of iron.

46.     During the same period, in what the Navy refers to as the "dense zone" of the Potomac River Test Range—just downstream of Swan Point, Maryland and Colonial Beach, Virginia—the Navy fired nearly 70,000 rounds of ammunition per nautical square mile.

47. The Navy has increased some types of weapons testing in the Potomac River since then. The Navy also recently proposed to expand the boundaries of the Middle Danger Zone of the Potomac River Test Range, to allow it to conduct testing activities on more of the river.

48. On information and belief, the Navy has never performed any water quality monitoring or sediment sampling to understand the impacts of its weapons testing activities on the Potomac River's ecosystem and water quality or on public health.

49. The Navy does not have an NPDES permit to authorize its ongoing discharges of pollutants into the Potomac River.

50. The Navy has not received a Presidential exemption to excuse it from the NPDES permitting requirement for its weapons testing activities in the Potomac River.

51. The Navy's obligation to secure an NPDES permit for firing munitions into navigable waters has been settled in the courts for more than 40 years. In litigation over Navy weapons testing activities on the Island of Vieques, Puerto Rico, the Navy was ordered to apply for an NPDES permit in 1979. *Romero-Barcelo v. Brown*, 479 F. Supp. 646, 664, 708 (D.P.R. 1979). On appeal, the U.S. Supreme Court reversed the appeals court's order directing the district court to enjoin the Navy's weapons testing, but it did not question the district court's holding that the Navy was required to obtain an NPDES permit. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 308 (1982). The Navy ultimately complied. *See* 49 Fed. Reg. 43,585 (Oct. 30, 1984). The resulting permit established water-

quality-based limits for pollutants associated with the Navy's discharges, and it required the Navy to conduct water quality monitoring and report the results quarterly. *Id*. at 43,586-87. Despite that history, the Navy has not fulfilled its obligation to apply for and comply with an NPDES permit for its weapons testing activities in the Potomac River.

## CLAIM FOR RELIEF

52. The Navy has violated and is violating 33 U.S.C. § 1311(a), which prohibits the discharge of pollutants from a point source into a navigable water without an NPDES permit.

53. The Navy discharges pollutants from point sources into the Potomac River through its outdoor research, development, testing, and evaluation activities at NSF Dahlgren, including by firing weapons into the river from guns and blowing up physical targets on or above the river.

54. These pollutants include bullets, other projectiles, explosives, wrecked or discarded equipment, and munitions constituents.

55. The Navy may only discharge these pollutants into the river pursuant to a valid NPDES permit. The Navy does not have a permit. Nor has the Navy secured an exemption that would allow it to discharge these pollutants without a permit.

56. The Navy's unpermitted point source discharges of pollutants occur within the entire Potomac River portion of the Potomac River Test Range, which is 51 nautical miles long.

57. Plaintiffs provided the Navy with advance notice of their intent to sue more than 60 days ago, and the Navy has not cured its Clean Water Act violations since then.

58. The Navy's unpermitted point source discharges of pollutants into the Potomac River violate the Clean Water Act.

## REQUEST FOR RELIEF

Plaintiffs respectfully request that the Court:

A. Declare that the Navy has violated and is violating the Clean Water Act by discharging pollutants through its weapons testing activities into the Potomac River without an NPDES permit.

B. Order the Navy to apply for an NPDES permit from the Maryland Department of the Environment for its weapons testing activities in the Potomac River.

C. Award Plaintiffs their costs of litigation, including reasonable attorney fees, under 33 U.S.C. § 1365(d).

D. Grant such other relief as the Court deems appropriate.

Dated: June 21, 2023

Respectfully submitted,

/s/ Aaron Colangelo
Aaron Colangelo (D. Md. Bar No. 30670)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
Phone: 202-289-2376
Fax: 415-795-4799
acolangelo@nrdc.org

/s/
Nanding Chen
*Pro hac vice motion forthcoming*
Natural Resources Defense Council
111 Sutter Street, Floor 21
San Francisco, CA 94104
Phone: 202-469-8230
Fax: 415-795-4799
nchen@nrdc.org
(signed by Aaron Colangelo with permission from Nanding Chen)

/s/
Robert G. Dreher
*Pro hac vice motion forthcoming*
Potomac Riverkeeper Network
3070 M Street, NW
Washington, DC 20007
Phone: 202-309-6890
Fax: 415-795-4799
bob@prknetwork.org
(signed by Aaron Colangelo with permission from Robert G. Dreher)